Sonson et vir *v.* J. C. Penney Company, Appellant.

Argued March 22, 1949. Before Maxey, C. J., Drew, Linn, Stern, Patterson and Stearne, JJ.

*George Y. Meyer,* with him *Samuel G. Wagner* and *H. Gilmore Schmidt,* for appellant.

*J. Salem Flack,* for appellees.

Opinion by Mr. Justice Linn, April 11, 1949:

Defendant appeals from judgments on verdicts for husband and wife in this action for damages for personal injuries sustained by the wife. The trial involved the difficulty of showing what, if any, disability resulted from an accident as distinguished from disability attributable to the natural progress of heart disease from which the wife-plaintiff was suffering at the time of the accident. Each plaintiff received a verdict of $7,000, which, in the wife's case, was reduced by the trial court

to $4,500. Judgments were then entered in favor of the husband for $7,000 and in favor of the wife for $4,500. We shall refer to two of appellant's complaints: (1) that there is insufficient evidence justifying the amounts of the verdicts and (2) that plaintiffs failed to examine the attending physician, Dr. Dunbar, when on the witness stand, on the subject of aggravation.

We all agree that a study of the record in the light of appellant's criticisms leads to the conclusion that this was an unsatisfactory trial and that it is our duty to order the case to be retried: compare *Goldman et al. v. Mitchell-Fletcher Co. et al.*, 285 Pa. 116, 119, 131 A. 665 (1926); *Gail v. Phila.*, 273 Pa. 275, 278, 117 A. 69 (1922); *Tauber v. Wilkinsburg*, 309 Pa. 331, 336, 163 A. 675 (1932); *McGuire v. Hamler Coal Mining Co.*, 355 Pa. 160, 163, 49 A. 2d 396 (1946); *Bittner v. Saltlick Township*, 109 Pa. Superior Ct. 406, 412, 167 A. 483 (1933).

The wife-plaintiff on July 30, 1944, had suffered a coronary thrombosis and spent about seven weeks in the Washington Hospital. The injury which led to the present suit occurred July 30, 1946, while she was shopping in appellant's department store in Washington. She claims that she fell, while on the fourth step, descending a stairway from the first floor to the basement, injuring her left leg at and below the knee. She testified, "As I was going down to the basement, I felt my foot—something breaking underneath from the right foot on the ball of my foot." This occurred "right on the edge of this step," ". . . as the step broke it slipped my foot and my heel caught on the step there and throwed me over the banister." We have found nothing to show how her heel could have caught, nor does it appear whether the heel came off her shoe or was otherwise displaced. She said, as a result of what occurred, "I passed out and they put me on a chair and there was a boy fanning me." She was asked, "Q. What did you fall on as you

were going down the steps—your side, or what did you fall on? A. On my left side, it hit the railing." She had been preceded down the stairs by two ladies. After the accident various store employes came to the scene among them W. L. Cary, assistant manager of the store, who told her (so she testified) "he knew that step was rotten and needed repairing, but he couldn't get anyone to do it at the present time." She testified that as she walked up the stairs, after the accident, she "noticed that they were broke off," specifying "the fourth step from the top"; "there was a piece laying on the second step from the bottom." This piece of wood is referred to in the briefs as a sliver and as two or three inches long, one-half inch wide and one-eighth of an inch thick. Plaintiffs' daughter, then aged thirteen years, accompanied her and also testified. She gave a description of this sliver of wood: "I noticed the wood was on the lower step from the fourth and I picked it up and it crumbled in my hand because it was rotten." One naturally asks why, if it was rotten, the wood did not "crumble" when the plaintiff stepped on it and broke it from the rest of the step, as she said she did. She was taken by one of defendant's employes to Dr. Clark for first aid. At the time of the accident the plaintiff was about fifty years old. She testified that before the accident, she "was able to do all my work except my washing." Since the accident, she said she cannot do her household work; "My chest hurt and my heart and I always got a sore spot right there (indicating)." She noticed this disability "immediately." Asked about Dr. Clark's services, she said, ". . . all he done was to put a piece of gauze where I got hurt. Q. Where were you hurt? Where did he put the gauze? A. On my left leg there," indicating "half way between the knee, from the foot up to the knee." Dissatisfied with Dr. Clark, she then sent for Dr. Dunbar. She was not asked and gave no details of what

Dr. Dunbar* did for her; it appears that at some un-specified time he advised her to go to California; on the day of the accident she was making purchases prepara-tory to going to California. Dr. Dunbar was called by plaintiffs and said he saw the wife-plaintiff in the Wash-ington Hospital in October, 1944, nearly two years be-fore the accident, and knew that she had been admitted there then suffering from coronary heart disease. It does not appear why this physician, who had treated her from the time of her injury to the time of her de-parture for California, was not asked by her counsel for what he treated her or for facts such as plaintiff was required to prove in support of the allegations in her complaint. If anyone can be assumed to have had first hand relevant knowledge of plaintiff's condition, par-ticularly the element of aggravation, it would seem to have been the physician who treated her at the time; the jury should have been advised of her condition by this physician.

Dr. Dunbar was followed to the witness stand by a Dr. Sposato who appears to have made only one exam-ination of the plaintiff, apparently to inform himself for the purpose of testifying as an expert at the trial. He testified that he examined the plaintiff on November 25, 1947, "more particularly the examination was one of the heart and circulatory system." He saw the hos-pital record and cardiogram of 1944, as we understand him, and "received a history from her both prior to July 30, 1946, and after." He stated that she then had a dilated and hypertrophied heart. "I classified Mrs. Sonson's heart as of that time being a coronary heart with an anatomical diagnosis of coronary heart disease,

---

* Except "Q. How long did you take treatments for that knee injury, leg injury? A. I took treatments. Q. And to what doctor did you go? A. Dunbar." He treated her until August 16th when she went to California.

anterior and posterior, and hypertrophied, with dilatation; the functional class is 4-D." He testified that he considered what he found on this examination in 1947 and the history related by her; he concluded, "in my professional opinion I believe the fall did aggravate the heart condition."

Dr. Shannon was plaintiff's next witness; he examined her on October 30, 1946, about three months after the accident and testified that she had sustained injury to the left shin, complained of pain over the knee and found a tenderness over one of the cartilages. He testified that the fall in defendant's store aggravated her heart disease ". . . for this reason: before the accident she told me she was able to do her housework with the exception of washing, she had done her ironing, I believe. Following that she was unable to do any heavy work at all; the most she ever did following that accident was to do a little cooking." The plaintiffs also consulted a Pittsburgh heart specialist who was not called to testify.

Although plaintiffs had the burden of proof, they asked no questions about her heart disease of the attending physician. She testified, "While I was there [in California] I felt all right, my heart, but my leg was bothering me right along. Q. And after you came back, what happened to the heart condition? A. I took another attack." On the issue of aggravation, the evidence of the attending physician would seem much more important than the evidence of experts testifying from the results of a single examination in response to uncertain hypothetical questions.

We think the interests of justice require a re-trial of the case; it is therefore unnecessary to refer to the evidence offered in defense which gives a very different picture of the stairway in question.

Judgments reversed and new trial granted.